## STATE OF CONNECTICUT *v.* LUIS FERNANDO LOPEZ
## (SC 17123)

Sullivan, C. J., and Borden, Norcott, Katz and Zarella, Js.

Argued September 10—officially released November 9, 2004

*John A. East III*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, *James Turcotte*, supervisory assistant state's attorney, and *Jason Germain*, assistant state's attorney, for the appellant (state).

*William M. Bloss*, for the appellee (defendant).

*Opinion*

KATZ, J. The defendant, Luis Fernando Lopez, appealed to the Appellate Court from the trial court's judgment of conviction, following a jury trial, of three counts of risk of injury to a child in violation of General

Statutes (Rev. to 1999) § 53-21 (2).[1] Following the decision of the Appellate Court reversing the judgment of conviction and remanding the case for a new trial; *State* v. *Lopez*, 80 Conn. App. 386, 835 A.2d 126 (2003); we granted the state's petition for certification to appeal, limited to the following issue: "Did the Appellate Court properly conclude that the trial court's inquiry into a possible conflict of interest between the defendant and defense counsel was inadequate and, if so, did the Appellate Court properly conclude that the defendant was entitled to a reversal of his conviction in the absence of a specific showing of harm?" *State* v. *Lopez*, 267 Conn. 912, 840 A.2d 1174 (2004). We conclude that the trial court's denial of the defendant's constitutional right to be present during the inquiry in question constituted a structural error warranting the automatic reversal of his conviction without a specific showing of harm or prejudice. Accordingly, we affirm the judgment of the Appellate Court.

The underlying facts and procedural history, as set forth in the Appellate Court's opinion, are as follows. "In March, 1999, the victim[2] and her mother moved into the defendant's home. The defendant and the victim's mother were romantically involved at that time. The defendant and the victim's mother shared one bedroom while the victim slept in a separate bedroom. The defendant used the victim's bedroom as his business office and kept his computer there.

---

[1] General Statutes (Rev. to 1999) § 53-21 (2) provides in relevant part: "Any person who . . . (2) has contact with the intimate parts, as defined in section 53a-65, of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child . . . shall be guilty of a class C felony."

[2] In accordance with General Statutes § 54-86e, as amended by Public Acts 2003, No. 03-202, § 15, and this court's policy of protecting the privacy interests of victims in sexual abuse matters, we decline to identify the victim by name, or others through whom the victim's identity may be ascertained.

"The victim alleged that soon after she moved into the defendant's home, he began molesting her by touching her inappropriately. The victim claimed that this behavior occurred frequently, and she provided descriptions of three such incidents. The first such alleged incident occurred in March, 1999, when the victim had gone to her bedroom, where the defendant was working on the computer, to ask for assistance with her homework. After the defendant declined to help her, the victim went to her bed to work on her assignment. She alleged that the defendant then went to the bed, pinned her arms over her head and rubbed her groin with his free hand. That alleged touching occurred over the victim's clothing. The second occurrence was in April, 1999. At that time, the defendant approached the victim while she was sitting on her bed. He allegedly kissed the victim on the face and again rubbed her groin over her clothing. The third alleged incident also occurred in April, 1999. The victim claimed that the defendant had approached her while she was standing in her bedroom and 'touched [her] in the corner.'

"The alleged molestation came to light when the victim disclosed it to several friends during a school field trip. A teacher's aide overheard the victim's conversation and confronted her with the information. The victim confirmed the allegations, but requested that the aide not tell anyone else. The aide, nevertheless, notified the victim's teacher and the school principal. The principal then notified the victim's mother and the department of children and families.

"A worker from the department of children and families interviewed the victim. During the interview, the victim repeated her allegations of abuse. The defendant subsequently was arrested and charged with three counts each of sexual assault in the third degree in

violation of General Statutes § 53a-72a (a) (1) (A),[3] sexual assault in the third degree in violation of § 53a-72a (a) (1) (B),[4] and risk of injury to a child in violation of § 53-21 (2). Following a jury trial, the defendant was acquitted of all of the sexual assault charges and convicted of each of the risk of injury charges." *State* v. *Lopez*, supra, 80 Conn. App. 388–89.

The defendant, with the assistance of new counsel, filed a motion for a new trial, alleging for the first time, inter alia, that he had been deprived of conflict-free representation at trial because his trial counsel had put himself in the position of being a material witness and that the court's inquiry into the matter should have been on the record. The defendant's motion was based on the following facts. "The victim made certain statements that were inculpatory as to the defendant and that were the basis for the state's bringing the charges of which he was convicted. Prior to trial, however, the victim wrote and signed a statement recanting her previous accusations against the defendant. The victim testified that she [had done] so at the insistence of her mother and the defendant. She further testified that the defendant [had] dictated the statement to her and that she [had been] angry that she was forced to write the statement because it was untrue.

"After the victim had written a statement recanting her accusations, the victim's mother and the defendant brought her to the office of the defendant's trial counsel,

---

[3] General Statutes § 53a-72a (a) provides in relevant part: "A person is guilty of sexual assault in the third degree when such person (1) compels another person to submit to sexual contact (A) by the use of force against such other person or a third person . . . ."

[4] General Statutes § 53a-72a (a) provides in relevant part: "A person is guilty of sexual assault in the third degree when such person (1) compels another person to submit to sexual contact . . . (B) by the threat of use of force against such other person or against a third person, which reasonably causes such other person to fear physical injury to himself or herself or a third person . . . ."

attorney Christopher W. Boylan. The victim later testified that she had had a private conversation with Boylan, during which she [had] told him that her handwritten statement was the truth. The victim's statement was then typed on stationery bearing Boylan's letterhead. The victim signed the typewritten statement, and Boylan acknowledged the statement as an officer of the Superior Court. At trial, she testified that she had been forced to make the statements, which were not true." Id., 389–90.

The trial court's memorandum of decision denying the defendant's motion for a new trial memorializes the following additional events forming the basis of his claim. At some point during the trial, "[t]he state informed the court, outside of the defendant's presence and off the record, that [Boylan] may intend to testify at trial.[5] The trial judge, in chambers, asked [Boylan] if he intended to testify and whether a new attorney should be obtained to represent the defendant. After consideration by [Boylan], he informed the judge that he did not intend to testify on behalf of the defendant."

In denying the motion, the trial court concluded that no conflict existed because Boylan did not intend to testify. The court reasoned "that it was entitled to rely on [Boylan's] assertion as an officer of the court and that it would be inappropriate to unnecessarily pry into defense strategy. Accordingly . . . there was no duty to conduct an inquiry on the record." Thereafter, the trial court also denied the defendant's motion for reconsideration.

The defendant appealed from the judgment of conviction to the Appellate Court, raising claims that, inter

---

[5] In the absence of any record of the trial court's in-chambers inquiry, it is unclear *precisely* when the discussion took place. During oral argument before this court, however, the defendant represented with certainty that the in-chambers inquiry had taken place after jury selection, and the state did not dispute this assertion.

alia:[6] (1) the trial court should have conducted an inquiry on the record and in the defendant's presence into whether a conflict of interest had existed between him and Boylan; and (2) the trial court improperly failed to conclude that Boylan had been burdened by an actual conflict of interest.[7]

The Appellate Court reversed the judgment of conviction and remanded the case for a new trial. In reaching its conclusion that reversal was mandated, the court first noted that, although sixth amendment claims of ineffective assistance of counsel generally should be asserted by way of habeas corpus rather than direct appeal, because of the need to develop an evidentiary record, this case was distinguishable. Id., 390. It concluded that here, the trial court's actions, which were evident from the record, were at issue, not the actions of defense counsel. Id.

Turning to the merits of the case, the Appellate Court concluded that, because the possibility of a conflict of interest was sufficiently apparent, the trial court had a duty to inquire about the conflict. Id., 392. The trial court's actions failed to satisfy that duty, however, because, in determining that Boylan was not going to testify, it had addressed only how the potential conflict would be handled and had failed to inquire into the actual nature of the conflict itself. Id., 393. The Appellate Court further noted that, because the defendant had not been present during the inquiry, it could not determine whether the defendant had consented to or waived any

---

[6] The defendant also claimed that the trial court improperly had denied his motion for a new trial because the verdict was inconsistent and because the prosecutor's comments during closing argument constituted misconduct sufficient to warrant a new trial. *State* v. *Lopez*, supra, 80 Conn. App. 387–88.

[7] Specifically, the defendant contended that Boylan's position as a material witness to, and participant in, the events surrounding the victim's recantation letter was in direct conflict with Boylan's role as the defendant's attorney and representative before the jury.

conflict. Id., 393–94. Finally, the Appellate Court was persuaded that the circumstances of the case clearly had presented an actual conflict of interest that gave rise to a presumption of prejudice requiring reversal of the defendant's conviction. Id., 394. Because this conclusion was dispositive of the appeal, it did not reach the defendant's remaining claims. This certified appeal followed.

The state claims that the Appellate Court improperly concluded that: (1) the trial court's in-chambers inquiry into the potential conflict of interest had been inadequate; (2) there had been an actual conflict of interest; and (3) no specific showing of harm was required. The state further claims that the defendant cannot show the requisite harm, namely, that his representation was affected adversely. In response, the defendant contends that the Appellate Court properly concluded that the trial court's inquiry, conducted off the record and in the defendant's absence, had been inadequate because of its failure to ascertain the nature or effect of the conflict of interest. We agree with the Appellate Court's ultimate conclusion, albeit for reasons other than those cited by that court. We conclude that the in-chambers inquiry regarding the potential conflict of interest was a critical stage of the defendant's prosecution at which the defendant had a constitutional right to be present. We further conclude that the trial court's failure to ensure the defendant's presence under these circumstances constituted a structural error warranting automatic reversal of the defendant's conviction.[8]

Before addressing the merits of the state's claims before us, we note that these claims present issues of law. Accordingly, our review is plenary. See, e.g., *State* v. *Gibson*, 270 Conn. 55, 66, 850 A.2d 1040 (2004).

---

[8] In light of our conclusion, we need not decide whether the Appellate Court properly determined that there was an *actual* conflict of interest.

We begin with a fundamental tenet of criminal jurisprudence: a criminal defendant has a constitutional right to be present at all critical stages of his or her prosecution. *Rushen* v. *Spain*, 464 U.S. 114, 117, 104 S. Ct. 453, 78 L. Ed. 2d 267 (1983) ("the right to personal presence at all critical stages of the trial and the right to counsel are fundamental rights of each criminal defendant"). Indeed, "[a] defendant's right to be present . . . is scarcely less important to the accused than the right of trial itself." (Internal quotation marks omitted.) *State* v. *Simino*, 200 Conn. 113, 127, 509 A.2d 1039 (1986). Although the constitutional right to be present is rooted to a large extent in the confrontation clause of the sixth amendment, courts have recognized that this right is protected by the due process clause in situations when the defendant is not actually confronting witnesses or evidence against him. *Snyder* v. *Massachusetts*, 291 U.S. 97, 105–106, 108, 54 S. Ct. 330, 78 L. Ed. 674 (1934); see *State* v. *Jarzbek*, 204 Conn. 683, 691–92, 529 A.2d 1245 (1987) (recognizing that right to be present similarly is guaranteed by article first, § 8, of our state constitution), cert. denied, 484 U.S. 1061, 108 S. Ct. 1017, 98 L. Ed. 2d 982 (1988). In judging whether a particular segment of a criminal proceeding constitutes a "critical stage" of a defendant's prosecution, courts have evaluated the extent to which " 'a fair and just hearing would be thwarted by [the defendant's] absence' " or whether " 'his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge.' " *Kentucky* v. *Stincer*, 482 U.S. 730, 745, 107 S. Ct. 2658, 96 L. Ed. 2d 631 (1987).

A determination that the defendant's absence from a critical stage of the proceedings violated his constitutional rights does not end the inquiry that a reviewing court must conduct in deciding whether to order a new trial. "The United States Supreme Court has recognized that 'most constitutional errors can be harmless.' . . .

*Neder* v. *United States*, 527 U.S. 1, 8, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999); see also *Arizona* v. *Fulminante*, 499 U.S. 279, 306, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991). 'The harmless error doctrine is essential to preserve the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial.' *Arizona* v. *Fulminante*, supra, 308; see also *Rose* v. *Clark*, 478 U.S. 570, 577, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986)." *State* v. *Anderson*, 255 Conn. 425, 444, 773 A.2d 287 (2001). In contrast, the Supreme Court has noted that there is a "very limited class of cases" involving error that is "structural," that is to say, error that transcends the criminal process. *Johnson* v. *United States*, 520 U.S. 461, 468, 117 S. Ct. 1544, 137 L. Ed. 2d 718 (1997), citing *Sullivan* v. *Louisiana*, 508 U.S. 275, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993) (defective reasonable doubt instruction); *Vasquez* v. *Hillery*, 474 U.S. 254, 106 S. Ct. 617, 88 L. Ed. 2d 598 (1986) (racial discrimination in selection of grand jury); *Waller* v. *Georgia*, 467 U.S. 39, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984) (denial of public trial); *McKaskle* v. *Wiggins*, 465 U.S. 168, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984) (denial of self-representation at trial); *Gideon* v. *Wainwright*, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963) (complete denial of counsel); *Tumey* v. *Ohio*, 273 U.S. 510, 47 S. Ct. 437, 71 L. Ed. 749 (1927) (biased trial judge).

"Structural [error] cases defy analysis by harmless error standards because the entire conduct of the trial, from beginning to end, is obviously affected . . . . These cases contain a defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself. . . . Such errors infect the entire trial process . . . and necessarily render a trial fundamentally unfair . . . . Put another way, these errors deprive defendants of basic protections

without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair." (Citations omitted; internal quotation marks omitted.) *State* v. *Anderson*, supra, 255 Conn. 445.

With these principles in mind, we turn to the case at hand. It is undisputed that the in-chambers inquiry into the potential conflict of interest took place during the defendant's trial; see footnote 5 of this opinion; and that the defendant was neither present for, nor invited to participate in, the discussion. In *Campbell* v. *Rice*, 302 F.3d 892, 899–900 (9th Cir. 2002), the United States Court of Appeals for the Ninth Circuit concluded that such a hearing was a critical stage of the proceedings and that reversal was mandated in similar circumstances. During the defendant's trial in *Campbell*, the trial court held an in-chambers hearing, on the record to inquire into a potential conflict of interest on the part of defense counsel. Id., 895. The hearing was initiated because the state had informed the court that defense counsel was being prosecuted on drug charges, unrelated to her client's case, by the same district attorney's office that was prosecuting her client then before the court. At that hearing, the trial court asked defense counsel one question—whether she wished to make a statement. Id., 895–96. After defense counsel declined to do so, the trial court determined that no conflict existed.[9] Id., 896. The defendant was neither present for nor informed of the in-chambers hearing. Id., 895.

---

[9] Once the court in *Campbell* was informed of this potential conflict, the following exchange took place:

" 'The Court: Do you wish to make any statement at this time, [defense counsel]?

" '[Defense Counsel]: No, that's fine.

" 'The Court: Very well. . . . The Court has determined there is no conflict of interest with respect to [defense counsel] as against her relationship with the district attorney in this case . . . .' " *Campbell* v. *Rice*, supra, 302 F.3d 895–96.

In concluding that the hearing was a critical stage of the proceeding, the Court of Appeals reasoned that, "if defense counsel's representation is hampered by a conflict of interest, the integrity of the adversary system is cast into doubt because counsel cannot 'play . . . the role necessary to ensure that the trial is fair.' *Strickland* v. *Washington*, 466 U.S. 668, 685, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Given that the right to conflict-free counsel must be preserved in order to 'ensure that the trial is fair,' id., the in-chambers hearing held to determine whether [the defendant's] right to conflict-free counsel had been violated must have been a critical stage of the criminal proceedings." *Campbell* v. *Rice*, supra, 302 F.3d 898–99.

Turning to the question of whether the lack of the defendant's presence fell into the category of structural error, the Court of Appeals in *Campbell* concluded: "[The defendant] would have been able to influence the process in a significant way had he been present at the hearing. . . . [Defense counsel, the defendant's] only representative at the in-chambers hearing, could not adequately represent [his] interest in conflict-free counsel because she was the subject of the hearing. As a result, [the defendant's] constitutional right to conflict-free counsel received no consideration beyond the judge's one question to defense counsel and the one word response that the judge received. Had [the defendant] been informed of [the] potential conflict, and were he or a court-appointed representative present at the in-chambers hearing, [the defendant] or his representative could have asked the judge to expand his inquiry into the potential conflict. Just as the denial of the assistance of counsel affects the integrity of an entire trial, [the defendant's] exclusion from this critical in-chambers hearing at which his counsel's potential conflict of interest was evaluated affect[ed] the trial from beginning to end." (Citation omitted; internal quotation marks

omitted.) Id., 899–900; see also *People* v. *Grigsby*, 47 Ill. App. 3d 812, 816, 365 N.E.2d 481 (1977) ("the hearing in chambers to determine whether [the] defendant's attorneys had a conflict of interest was a critical stage of the proceedings for the defendant").

We find this reasoning persuasive. "Where a constitutional right to counsel exists . . . there is a correlative right to representation that is free from conflicts of interest." *State* v. *Drakeford*, 261 Conn. 420, 427, 802 A.2d 844 (2002).[10] In the present case, the inquiry in question involved the identification of a potential conflict of interest for Boylan, during which he was placed in the conflicting roles of a potential material witness in the case and the defendant's legal counsel. In the absence of evidence to the contrary, we cannot presume that Boylan adequately represented the defendant's interests during the inquiry, particularly when Boylan's position as a material witness to, and participant in, the events surrounding the victim's recantation letter were in direct conflict with Boylan's role as the defendant's attorney and representative before the jury.[11] As a result, the defendant's right to conflict-free counsel was given no more consideration than a single question and a simple answer.[12]

---

[10] In *State* v. *Drakeford*, supra, 261 Conn. 426, we examined the adequacy of an inquiry by the trial court into defense counsel's possible conflict of interest. In addressing the defendant's claim that the trial court should have canvassed the defendant personally, we noted that the record of the two hearings held in court involving the potential conflict did not reflect whether the defendant had been present. Id., 426 n.10. The issue raised in that case was whether the hearings were adequate; no separate claim regarding the defendant's right to be present was raised.

[11] This is particularly true because Boylan's presence at and involvement in the preparation of the victim's letter recanting her previous accusations might have: impeded his ability to cross-examine the victim; made him a witness at trial; or exposed him, as it did the victim's mother, to a charge of witness tampering in violation of General Statutes § 53a-151, thereby putting him directly in conflict with the defendant.

[12] Although we have no reason to doubt that the off-the-record inquiry proceeded as represented by the trial court in its memorandum of decision,

Furthermore, the inquiry was substantially related to the defendant's opportunity to defend himself, and "a fair and just hearing [was] thwarted by his absence . . . ." (Internal quotation marks omitted.) *Kentucky* v. *Stincer*, supra, 482 U.S. 745. In order for the defendant to have had adequate knowledge of the potential implications of the conflict and for him to have had a fair opportunity to question the sufficiency of the inquiry or to have objected to Boylan's representation of the defendant's interests, he would have had to have been present during the proceeding.[13] This was not a situation in which the defendant could have contributed nothing had he been at the inquiry, nor can we state with *any* degree of confidence that he would have gained nothing by attending. See *Snyder* v. *Massachusetts*, supra, 291 U.S. 108. Accordingly, we conclude that the in-chambers inquiry regarding the potential conflict of interest was a critical stage of the defendant's prosecution at which the defendant had a constitutional right to be present.

Similarly, we conclude that the defendant's exclusion from the in-chambers inquiry amounted to structural error.[14] Although the United States Supreme Court has noted that most constitutional errors are subject to

we cannot presume any further discussion than that which the court provided in its memorandum of decision.

[13] Unlike cases in which the existence of an in-chambers conference subsequently is put on the record in open court with the defendant present, thereby affording him the chance either to object or to waive any objection to his having been absent from that conference; *United States* v. *Jones*, 381 F.3d 114, 122–23 (2d Cir. 2004); no such opportunity in the present case materialized.

[14] During oral argument before this court, the state conceded that, "if this court considers that this in-chambers conference was a critical stage of the proceedings . . . there is a structural defect . . . and we couldn't prevail in that regard." Despite the state's candor, and the evident overlap between the considerations relevant to the critical stage analysis and the structural error analysis under the facts of this case, we view the inquiries as having an independent factor, and we therefore address whether the error is structural or subject to harmless error analysis.

a harmless error analysis, it has drawn a distinction between a limited class of cases with "structural defects" in the trial mechanism that defy analysis by harmless error standards and the broader category of cases involving "trial errors" that occur during the presentation of the case to the jury, and accordingly may be quantitatively assessed in the context of other evidence presented. *Arizona* v. *Fulminante*, supra, 499 U.S. 306–309. In applying this distinction, the Supreme Court has recognized further that, when the consequences of the deprivation of the defendant's constitutional right are "necessarily unquantifiable and indeterminate, [the deprivation of that right] unquestionably qualifies as 'structural error.'" *Sullivan* v. *Louisiana*, supra, 508 U.S. 281–82.

In the present case, the potential conflict centered around the *pivotal* witness against the defendant—the victim—and the *critical* issue at trial—the victim's credibility. It is impossible to know, had the defendant been present, whether he would have initiated further inquiry into the conflict, requested new counsel or requested that Boylan testify on the defendant's behalf. Furthermore, we have no way of determining whether Boylan's cross-examination of the victim was affected because of his questionable role in securing her recantation letter. See footnote 11 of this opinion. It is equally difficult to assess how the jury perceived Boylan as a result of his interaction with the victim and if its perception of Boylan reflected adversely on the defendant. Thus, the consequences of the deprivation of the defendant's right to be present in this case are "necessarily unquantifiable and indeterminate," and the deprivation of that right "unquestionably qualifies as 'structural error.'" *Sullivan* v. *Louisiana*, supra, 508 U.S. 281–82.

We recognize that, in the vast majority of cases, we require defendants whose constitutional rights have been violated during the course of a trial to make a specific showing of harm or prejudice. We conclude

that to require a specific showing of harm in this instance would defy the very purpose and nature of the structural error doctrine. A structural error creates a defect in the trial mechanism such that, while it is virtually impossible to pinpoint the exact harm, it remains abundantly clear that the trial process was flawed significantly. For this reason, "[e]rrors of this magnitude are *per se* prejudicial and require that the underlying conviction be vacated." (Emphasis in original.) *Lainfiesta* v. *Artuz*, 253 F.3d 151, 157 (2d Cir. 2001), cert. denied sub nom. *Lainfiesta* v. *Grenier*, 535 U.S. 1019, 122 S. Ct. 1611, 152 L. Ed. 2d 625 (2002), citing *Neder* v. *United States*, supra, 527 U.S. 8–9; see also *Sullivan* v. *Louisiana*, supra, 508 U.S. 280–81 (harm resulting from erroneous jury instruction on definition of reasonable doubt impossible to quantify because court can only speculate what properly charged jury might have done); *Vasquez* v. *Hillery*, supra, 474 U.S. 263–65 (harm resulting from racial discrimination in grand jury cannot be quantified because impossible to know whether decision to indict would have been assessed same way by properly constituted grand jury); *Waller* v. *Georgia*, supra, 467 U.S. 49 n.9 (harm resulting from denial of right to public trial unquantifiable because benefits of public trial are intangible, virtually impossible to prove); *State* v. *Murray*, 254 Conn. 472, 497–99, 757 A.2d 578 (2000) (harm resulting from improper substitution of alternate juror for excused juror after deliberations had begun impossible to quantify because court cannot ascertain whether jurors would be capable of disregarding prior deliberations and receiving potentially nonconforming views of alternate juror).

"If a reviewing court determines that the error is of the structural variety, the court's task is at an end." *Peck* v. *United States*, 106 F.3d 450, 454 (2d Cir. 1997). We conclude that the denial of the defendant's constitutional right to be present during the in-chambers inquiry

constituted a structural defect warranting the automatic reversal of the defendant's conviction and the granting of a new trial without a specific showing of harm or prejudice.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.